Our next case, actually there are three cases. Three-year term of probation. Okay, three-year term of probation, which is still... May it please the court, Randall Wanger for appellants, John McTiernan, John Holman, and Ed Snow. How are we dividing time here? I think we... Go ahead. My understanding is that you've given me a 30-minute block, and I'll argue all three cases within the 30-minute block. All right, that's fine. Although I'd like to reserve five minutes for rebuttal. All right, that's fine. And all three cases deal with a common theme, whether unpopular speakers can use a public alley, a traditional public forum, just like everyone else, or whether unpopular speakers can be subjected to arbitrary police harassment, which ultimately leads to a complete ban on their use of the alley that others are allowed to use. All right, you say unpopular speakers. Yes. Are you getting to the issue of content neutral? Yeah, I think... Enforcement of a safety requirement here? Well, again, I'll try to answer both of those. As far as a safety requirement, there wasn't any specific city ordinance or state law that was prohibiting them from being in the streets. Instead, there was a police directive in all three of these cases that resulted in folks not being able to use the alley. A police directive? Police directive, yes. And what was that? It differed slightly in all three cases, but in the McTiernan case... Was it a directive of the city promulgated by the council or by a directive of the chief who was the defendant here? I'm asking, what was the directive? The directive was ad hoc by the police officers at the scene. How is that a directive of a department? At this point, Your Honor, the cases that we have are summary judgment as to the individual officers. The city was dismissed... You chose to use the word directive. Now, as with all matters of semantics, a word is used because it means something. What does it mean here? What I'm saying here is that the police officer themselves were saying, you cannot use this alley. In the McTiernan case, when Mr. McTiernan got to the scene, he was told by the police officer, you can't stand in, you can't use, you can't linger in the alley. It really was linger and stand in. The moving through, I don't think, is at issue, is it? Well, yes, it is. And I do want to clarify that because the officer at first said no lingering, but the officer later said, you can walk in the alley so long as you do it in the right way. You can do it as long as you do it correctly and legally. So, Mr. McTiernan wanted to use the alley. To him, the use of the alley was crucial. So, he said, okay, how can I do this legally? How can I do it correctly? And the officer just was stone-faced and kind of smirked. And that's a violation of First Amendment. I mean, we saw the videos and we saw what was going on here. And the officer had given him, indicated, and then he kind of looks like a little bit of a baiting exercise, actually. You know, can I do this? Can I do this? Can I do this? By the officer not responding to him, did he violate his First Amendment rights? Well, I believe he did because by the officer not responding to him, he was entirely precluded from walking in the alley. The officer said, you can walk in the alley. He said, okay, I'm going to walk to the end of the alley, I'm going to walk back again, and you tell me if I'm doing it legally. So, he walked to the end of the alley, he walked back again, and the officer said, if you do that again, I'm going to arrest you. So, what we had in the end was a police command that you can't walk to the edge of the alley, even though state law allows you to walk to the edge of an alley. Was this content neutral? How was this not content neutral? I mean, you've got to address the prongs here. Yes. Okay. It's not content neutral because really the restriction of entirely staying out of the alley was only applied against Mr. McTiernan and the pro-life crowd. It was not applied to others who could use the alley. They could cross the alley. Mr. McTiernan was told, you can use the alley, you can walk in the alley, but when he tried to get clarification, the clarification was just so vague that he was completely shut down from being in the alley. He went back. There's no showing of any prohibition or prevention here, is there? On that day in question, he was told he would be arrested if he walked to the end of the alley, so he didn't do so that day. And the end of the alley is important because he was told he would be arrested if he walked to the end of the alley. Is that literally correct? As Judge Rendell has said, we've all watched the discs. Remember that language. He was told that he would be arrested if he did that again. The police officer, when he came back from walking to the end of the alley, walked back. It was something apparently in the manner in which he was walking, but not the fact of walking to the end of the alley. Isn't that correct? We can't tell because the police officer wouldn't give any clarification, and that's the problem here. We're dealing with a command by a police officer that's not based on a law that was void for vagueness. There wasn't any – Didn't Barth inform members of both the anti-abortion and the Planned Parenthood folks that they really should only cross at the intersection of South Beaver Street? Wasn't there instruction on both sides? I mean, I have appendix references. Yes. And I read it. Yes, there was, but that wasn't the end of the story because – We got the English walking going here. Well, we got the English walking, which is interesting as well. He denied it for saying that in depositions. We don't know what he meant by that. Tell me why there is an actionable First Amendment violation here, violation of his First Amendment rights. Because he could not hold signs or speak to the people who were entering the rear of – He could not hold signs? He could not hold signs. He could not speak to? Where's that? If he can't be in the alleyway, then he can't hold signs and speak to the people. Where is there in the record anywhere a suggestion, let alone a directive, that he could not be in the alley? It's implicit in the video. He was in the alley. He was in the alley. He did walk in the alley. He walked in the alley, but he was told if he did it again, he would be arrested. If he did what again? If he walked along the edge of the alley, he would be arrested. Didn't Sergeant Barth use the words correctly and legally at some point during this exchange with reference to the manner in which Mr. McTiernan walked? Yes. Doesn't that modifier by definition suggest that there was no command that he not walk or that he was not able to walk? Rather, by definition, it had to be referring to the manner in which he was permitted to walk. Your Honor, I would agree with you, but the implication when the police officer refuses to tell him what he's doing wrong other than you're going to be arrested, if you do that again, he's left with no understanding of how to do it correctly. He was walking along the edge of the alley. He was doing basically what state law requires when you're along a city street. So why did he go up to where they were told they could go at the intersection of South Beaver? There's nothing in the record to say that 90% of the people go in the back ramp. I mean, the record here is minuscule. There's one statement by Snell in his affidavit that's very vague about the desire to use the back ramp, but there's no evidence at all that in order to express their views, access at the back was absolutely critical as compared to any other of the numerous alternatives. There are alternatives to reaching different groups. There are some people who go only into the rear entrance. There are some people who only go into the front entrance. What's the record with respect to whether the restriction here foreclosed alternatives, adequate alternatives, which is a key ingredient here? It doesn't foreclose all alternatives, but it does foreclose the ability to reach the people going in the back. How do we judge the magnitude of that? If that's 98% of the people, then you've got my attention, that then nothing else is going to the freedom to be at the front of the building is meaningless as compared to the back, but there's nothing in the record to that effect. I'm not going to tell you how many people were going to the front versus the back, because I don't have that in the record and I apologize, but it's impossible from the sidewalk in the front to be able to reach the people in the back. The distance is too far. There's no sight, and so that's why going into the back was crucial to his speech. As far as Mr. Snell, he wanted to be toward the front of the alley, toward the front entrance, and that was important to Mr. Snell because those who actually park at the parking lot parked right across the street from Planned Parenthood, right across the alley. So they cross the alley, they're immediately onto the sidewalk and immediately up a ramp. So for Mr. Snell, the time to reach them is when they're crossing the street. He wanted to be able to meet them, hand them literature as they were crossing the street, and he was told... He couldn't have handed literature across the railing, the ramp? No, that's very difficult, Your Honor, with the way that this works because the Planned Parenthood personnel will surround the clients who are going into the clinic. So if you can meet them out in the open, you can stop and hand them literature. But once you're on the ramp, you're divided by the ramp, by the railing of the ramp itself, and divided by people. So you really can't effectively reach across. The most effective time to get them to be able to hand literature and to say a word to them is right when they're crossing the alley. And others were allowed to be in the alley in order to cross. Mr. Snell wasn't... Isn't there a real... We need to have a real understanding of exactly what was permitted, what was prohibited. Yes. The people who walked through the alley with the patients and kept moving. Yes. That was okay. But the stopping and the impeding such that then if a truck comes, you're stationary. That was the problem. Isn't that correct? And is that what Snell did? The restriction on Snell was, according to the police officer himself in depositions, he said, I told Mr. Snell he couldn't enter the alley. Did you ask that? Did you say the same thing to the Planned Parenthood people? And his response was basically that they were permitted to use the alley to cross, but Mr. Snell wasn't permitted to be in it at all. And that's exactly... He was in it. No, that's not correct. Snell's case differs factually from the other two, doesn't it? All three of them differ factually. All three of them deal with the alley. In Mr. Snell's case... In Mr. Snell's case, is there or is there not, because I may be misapprehending the allegations here, Mr. Snell was, according to your theory, denied access to or the opportunity to walk in the alley at all as opposed to the other two plaintiffs. Am I correct in that? Mr. Snell was denied the opportunity to walk in it at all. That's correct. I'm also arguing that effectively Mr. McTiernan was denied the opportunity and Mr. Holman was denied the opportunity as well. But Snell really wasn't denied the opportunity. He, in fact, did it with Mrs. Spoonseller, right? He walked in and gave her and stopped her and was in her face, and then the officer said, if you do that again, you will be arrested, because there was, he observed, blocking and impeding. There might be a fact issue about what happened, but he wasn't arrested until he, quote, did that again. Is that not correct? Well, no. Actually, the second time that he entered, the police officer states, the police officer states, quote, I believe he was trying to distribute literature or say something to the people in the vehicle. The second time there was a vehicle that pulled in and he walked into the alley. The police officer went on to say he stepped into the alleyway. Once he did that, I arrested him. So he wasn't, he wasn't blocking anything. There might be a fact here. There are certainly a lot of issues of fact here. So this case is not, it's not appropriate for summary judgment. Even as, even as to the first incident, when it came to bumping, we asked the police officer during depositions, when you say bumping, I take it it wasn't anything terribly serious. No, it was just kind of like forcing literature on them and making some sort of physical contact. Did the escorts and the patients proceed on their way to the facility at that time? Yes. So we didn't actually stop them from going in. No. Well, but the patient said that he was in my face. And if you read the disorderly conduct statute, a lot of it has to do with a subjective annoyance, et cetera, et cetera. It's not that far off. Well, that's part of what needs to be proved with disorderly conduct. But folks can't be shielded from a message that they don't want to hear. Pardon me? Folks cannot be shielded from a message that they don't want to hear. Under freedom of speech, there needs to be well-defined limitations. With disorderly conduct, for instance, in order to make out disorderly conduct in the state of Pennsylvania, a person needs to be engaging in activity that has no legitimate purpose. Well, no, no, no. It's justified if it is for a legitimate purpose. If you go into a, you know, if the movie theater is on fire and you go in and tell people there's a fire, get out. You know, they're going to be upset. Maybe they fall over each other, but, you know, and maybe it's disorderly. But you've done something that has a legitimate purpose. Right. You're saying they could do whatever they wanted in terms of getting in the face and stopping these people, but because their purpose to themselves was legitimate, they're entitled to do it? Well, the First Amendment purpose, if it's handing literature to somebody, which really factually is what we have in this case, we're not engaging in any activity. They were not engaging in any activity that was illegal, just handing literature. No, but if somebody says, you know, they're up in my face, that connotes something different from someone going across at the same time as the people in the white coats are going across and saying, Madam, here, and moving along with them, here's some literature. Thank you very much. As compared to in your face. We know what that means. And I would say, Your Honor, that there is a factual issue as far as that goes because the description of the scene wasn't one where there was harassment. The description of the scene is handing literature to somebody who obviously didn't want it, but there is a First Amendment right to hand literature to people who don't want it. Would you help me out by describing to me what First Amendment standard we should be looking at here? I believe that we should be looking at a strict scrutiny standard, the least restrictive means for a compelling governmental interest, because I believe that what's happening is on account of one group being, for instance, Mr. Snell being entirely kept out of an alley that others were allowed to use. I would also say it's strict scrutiny because. But it was arbitrary, but it was still content neutral, was it not? I mean, what do we know? They might have been enforcing it not as equally, but what do we have to say that these police officers were doing this because of the content of what there was? Well, it's even. If they were doing it at all, they were annoyed. I can see that on the DVD, but you couldn't see that it had any relation to a viewpoint. Well, you don't need viewpoint for content discrimination. There was one group who was allowed to use it and another who wasn't. And in addition, the arbitrary restriction itself doesn't constitute a time, place, and matter restriction. According to a foresight versus nationalist movement, it can't be a time, place, and matter restriction if it leaves the opportunity for an arbitrary enforcement. And arbitrary enforcement is all that's left when there's no underlying law that prohibits the activity that they were engaging in. Of course, we have no indication that the Planned Parenthood people did what these gentlemen, in terms of the conduct. There's no testimony, is there, that they stopped in the alley or blocked in the alley or did anything other than moving people through fairly quickly, is there? I mean, there's a different activity going on here. Yes, there's a different activity, but we're only arguing for the opportunity to be in the alley equally with those who are already crossing. Not taking up time to linger in the alley, but to just step in and hand literature. He was arrested. He was arrested the second time because he entered the alleyway. There was no blockage. Well, there may be a fact issue as to exactly. From my reading of it, he did block or impede or it appears he was in the face of Sponseller. And the officer said, if you do that again, you're going to get arrested. And then a car pulls up and he goes toward the car and the officer basically says, okay, you know, that's it. It could be that the officer saw him doing something impeding or maybe he just was anticipating, but there might be a fact issue. There may be a fact issue and it's clearly not ready for summary judgment. At the same time, if there's a car already blocking the alleyway, there's nothing that he can be doing to block the alleyway further. The police officer himself stated that he was arrested as soon as he stepped into the alley. He wasn't arrested the first time. He was arrested the second time. Whether it's a strict scrutiny standard or a heightened scrutiny standard, Your Honors, I would argue that it fails either test because what we had going on here was not the least restrictive means and it was not narrowly tailored. Instead, with Mr. Snell, it was you can't be in the alley at all. You want to tell us how you distinguish a strict scrutiny from a heightened scrutiny? Yes. Under heightened scrutiny, it would obviously be narrowly tailored to a significant governmental interest. And so the standard under strict scrutiny, if we can show that there was content discrimination or if we can show that there was an arbitrary standard being used, we'd be entitled to strict scrutiny. But even under heightened scrutiny, even under narrowly tailored to a significant governmental interest, the tailoring isn't present in an arbitrary police directive. And what they could have done to narrowly tailor if they were truly concerned about traffic, there's a police officer already standing there at the street corner who could direct traffic. That doesn't seem to be the primary concern. In fact, when Officer Camacho, before he went to the scene, he talked to the ADA and another officer, and he stated in his depositions as follows regarding that conversation, I'd like a little bit of advice here if I run into a problem with the abortion protesters kind of bumping into these people or give me some legal advice as far as the alley is concerned. You know, I want to know if I'm going to be legally justified in making an arrest if there's some sort of blockage there in that alleyway. And he told me, yes, I can make an arrest, and he said I should arrest for disorderly conduct. And what does that show? It shows that his stated concern at that point wasn't safety. He was talking about blockage. He was talking about bumping. Isn't that related to safety if things were blocked and then the truck? I mean, we had the situation with Holman that I hope you will get to where Holman basically said he had to jump because he was about to be run over by this 18-wheeler. It's like there's a safety problem to me. The Holman situation was the very last of these three incidents to occur. So, at this point, they could not have been envisioning the Holman situation. At this point... Well, but you could, as a practical matter, knowing the cars turn in here without a whole good sight line and go down to the business. I mean, it stands to reason there's an alley that traffic turns in, and if somebody's standing in it, they could get hurt. That's true, but as a practical matter, this alley is really no more dangerous than any other alley that allows people to walk up and down the alley where people are allowed to cross, where people are allowed to talk, where trucks will stop and load and unload. It's really no different than any other alley in the city of York, except... Well, if there were more police, maybe they should police the alleys because I'm sure there are plenty of accidents that do occur. Can you get to Holman and tell us what the trespassing... Yes, Your Honor. ...and why we should overturn that? Yes, Your Honor. With regard to Mr. Holman, he was at the edge of the alley, and a truck pulled in and came close to him. By the police officer's own testimony, he would have been hit had he not moved, and according to the police officer's own testimony, he took the most direct route to get out of the way of the truck. And our argument is that there's an obvious affirmative defense to trespass, in this case necessity. So what? There's a... So what? An affirmative defense is available. So what? How does that impact at all on the officer's conduct? Well, there's no probable cause for the arrest if there was an obvious affirmative defense. If there's no probable cause, there's no probable cause. There's no reason to discuss the availability of a bill known of an affirmative defense. Well, there's no... In the probable cause analysis, you need to look to the affirmative defenses. Why? Because in this case, the probable cause turns... What do you do when you don't have a statute that provides an affirmative defense? Well, this affirmative defense doesn't even come from this statute. The affirmative defense comes from the affirmative defense statute. I understand that. I'm an old Pennsylvania prosecutor. Pennsylvania Crimes Code pretty well. What difference? Well, with any affirmative defense, and you asked me to discuss Radish v. Goode, Radish v. Goode stated that for probable cause analysis, when an affirmative defense is involved, you look to see whether the facts would have been obvious to a reasonably prudent police officer... And what does the police officer do at that point? Does he go through some kind of mental process that requires him to have the trial unfold in his mind and determine whether or not a finder of fact is going to believe the evidence supportive of an affirmative defense? Certainly, we would never expect a police officer to have to jump through something that's difficult and confusing. Like in the Radish v. Goode case, the affirmative defense in that case had to do with whether being on private property was appropriate, whether somebody could place a condition on the private property that prevented speech activities from occurring. And the court said, look, we can't expect any reasonable officer to know the facts, to know the law. There's no way that they're going to be able to figure that out on the fly. And I recognize that we don't want to put our police officers into the position of being attorneys. My argument, though, is that based on Radish v. Goode and based on the language in there regarding affirmative defenses, this is the kind of affirmative defense where the facts are obvious at the time that they're occurring. But wouldn't the officer be justified in saying, you know, there was no need for this. I told him that he wasn't supposed to be there. This is of his own creation. I mean, necessity basically doesn't apply when you put yourself in harm's way and you yourself have caused the situation by being there. Couldn't a reasonable officer process that pretty quickly? Also, this officer, and I'll just say two other things, testified specifically that he could have walked back. He could have walked back in the alley. He testified that the truck wasn't going that fast and that he could have walked back in the alley. So the officer on the scene isn't processing the fact that there's definitely a necessity defense here. Yes. He could have walked backwards, but the police officer also stated that he took the quickest route of escape. And really, for the defense necessity, it doesn't require an objectively that's the only thing you could have done, but that the actor believed that what he was doing was preventing harm that was greater than the harm being prevented by the statute. Are you, just one question. And do I understand you to be saying that if there's not an affirmative defense issue here, we have the elements of trespass? Yes, Your Honor. You do. He was on Planned Parenthood's property. Momentarily, he stepped onto the property. The argument is that it was an affirmative defense to do so, a de minimis step to avoid being hit, and that that should have been obvious to a reasonable police officer at the time. All right. Thank you. Do you reserve rebuttal time? Yes, five minutes, Your Honor. Thank you. May it please the Court, good afternoon. My name is Jim Young. I represent all the appellees on all three of the cases. After listening to Your Honor's questions, I'm very apprehensive about taking the podium at this time. I thought you were doing a very fine job in identifying why the district court decision should be affirmed. Basically, you have three individual officers. They're assigned to an overtime duty assignment. There's simply not enough officers in the city to take somebody on active patrol and put them at this one. Well, they're being paid, aren't they? Yes, they are being paid. I'm not arguing it's not safe. Police for hire. Exactly. As do other businesses such as the hospital, the bowling alley, and other places throughout the city are hired on a contractual basis. They're there to plan parenthood facility to ensure public safety and order and to promote the free flow of traffic on the public streets. The appellants do not believe that there should be any restrictions on their conduct whatsoever. Well, no, they're trying to say they should have the rights equal to everybody else. Okay. And they should be able to be in this alley because other people are in the alley. And when you tell them you'll be arrested if you do this again, it chills their free speech. Why doesn't it? Well, I want to make one point before I get that. This is a fourth case, which is what my point was leading up to on appeal here before now. It's been briefed and will be argued in January, in which the appellants want access to the handicapped ramp leading up to the door to the facility. What does that have to do with these three cases? I'm just trying to show how to what an illogical conclusion they are trying to get access to. In terms of content neutral, there was nothing in the record to suggest that the exercise of their religious beliefs was what motivated the command, the admonition, the order, whatever you want to call it, from the officers. The record, and it's set forth in Judge Jones' three separate opinions, documents that the same order, command, admonition was given to both sides. As a matter of fact, on one of them- You're saying that it was requisite to show that the police officers were issuing orders based on their antipathy to the religious interests of the- With respect to the free exercise claim, yes, and with respect to this free speech claim, with respect to whether it was based on- Does the police officer- Are you saying that one has to demonstrate that the police officer was going after somebody's religion? I just think from their political view. You have to show that it was based upon the content of whatever First Amendment activity or conduct was being done and that whatever order, admonition, or command was given by the police officer was not of general applicability. And in this case, it was of general applicability. These appellants videotape anything that happens that is out of the ordinary when they're at the Planned Parenthood facility. You have three separate videotapes that show snippets of- What does that have to do with anything? Well, if there was- It might be different if the police were videotaped. Well, if there was, as they allege, disparate enforcement of the order, command, or admonition based upon the viewpoint- This is an appeal from summary judgment. You're telling us there is nothing in the record, including what's on these DVDs, which is part of the record, that shows that kind of disparate enforcement. There's nothing in the record that shows that any Planned Parenthood patron, employee, volunteer, any pro-choice demonstrator was allowed to linger in the alley to obstruct people crossing the alley or to do anything that the police had directed both sides not to do. With respect to- Where was the- You say the police had instructed both sides not to do. Where do we find that instruction? Was that given by each of the officers? Yes, and there's specific references in each of the decisions. If you look at footnote number two in the Snell decision, during his deposition, Snell was specifically asked who was present when Camacho gave his instructions to stay out of the alley. Snell named four other pro-life advocates and then stated there were, of course, Planned Parenthood personnel there and identified three Planned Parenthood employees and a couple of other escorts who were there. When Camacho gave his instructions, Snell testified under oath that he does not recall Planned Personnel personnel standing or lingering in Rose Alley. And Holman was specifically- Everyone was specifically told there's private property. And I believe that there's the same reference in the McTernan. If you look at footnote one on page four of the McTernan decision, the videotape that depicts Barth giving instructions regarding walking and standing in the alley to both the pro-life protester filming the video and the on-walking Planned Parenthood personnel, the video depicts Barth moving toward other individuals, including Planned Parenthood personnel, stating that he was going to spread the word and that Barth gave the same instructions in the alley to both groups. There's a specific reference in footnote number one to the time that that appears on the video. There's not a scintilla of evidence before your honors that any employee, volunteer, patron, or anyone else that supposedly sided with the pro-choice side of this issue was allowed to do what the officers- Mr. Young, did you say that the video shows a police officer giving instructions to both sides? Yes, in the McTernan case, and that's noted in footnote number one of Judge Jones's decision with a reference to one minute and 11 seconds to one minute and 15 seconds of the video, two minutes and three seconds to two minutes and six seconds, three minutes and three seconds to three minutes and 11 seconds, where the reference is with respect to McTernan. Now, Mr. Snell tried to create an issue of fact- Were there instructions, and did you say that an officer gave the same instructions or is to be found on the videotape, giving such instructions with respect to Coleman and Snell? Yes, and I believe it's a reasonable inference when you hear him saying, I'm going to go spread the word after giving it to both sides in one location and then walking to another location and engaging them in conversation. The plaintiffs, the appellants have not come forward with any evidence other to say that any deposition testimony from anybody associated with Planned Parenthood, that they were told that, you know, that didn't apply to them, that they could linger in that. This is a 20-foot alley. It's got two-way traffic, including 18-wheel tractor trailers going to a printing business. It also is used in terms of dropping people off at the parking lot, the private, either owned or leased parking lot across the alley, bringing people across the alley and right at the end of the alley there is the end of the ramp that leads up to the facility. In all three cases, there's overhead pictures that shows this. There is an 8-foot by 5-foot landing at the bottom of the ramp. I don't know where you could have more effective communication with someone going into a facility other than at the concrete block sidewalk at the bottom of the base of the ramp where people go up. Is that public property? The sidewalk is public property, yes. So that's the alternative, you say? Yes. There's also, if you look at the overheads, the facility is here. Here is Rose Alley. Here's the parking lot. There is a public sidewalk on this side of the parking lot. There is a public sidewalk along Beaver Street that comes down and then makes a left, like an L-shape there, right along Planned Parenthood. So if somebody's driving up this way, you can engage them. Or if they're walking up, you can engage them the full length of that sidewalk, all the way down the sidewalk adjacent to the handicapped access ramp, which is the ramp that everybody uses, right at the bottom of it. There's also a public sidewalk, if you go into the back parking lot, on the far side of Planned Parenthood down here. We have a map, an aerial picture, and we have the DVD, but it doesn't show a lot of these things. Were there actual photographs admitted into evidence of different locations? I do not believe so. I do believe, if memory serves me correct, that the aerial photograph does show the sidewalks. Tell me about Holman. He's standing there. All of a sudden, the truck comes around the corner, and he jumps onto the curb and then touches the property for what he calls it a millisecond, and somebody else calls it brief. Then he gets arrested for trespass. Is that really what we have here, a trespass? Yes, Your Honor. I have a question as to what trespass was charged, whether he was charged with a statutory offense. It's interesting that before the magistrate, the prosecutor admitted he didn't think he could prove what he was charged with. Well, first of all, this is December 7, 2005. You already had the incident on June 28, 2005 when Mr. McTiernan and one other member of his group claimed that they were almost run down in the alleyway. You have another incident on September 28, 2005 involving safety hazard with people in the alleyway. Mr. Holman admitted in his deposition testimony that he had been there, I believe, a dozen times before. He knew that that lot was private property. He knew of the prior safety incidents involving tractor trailers and vehicles coming down the alleyway. Does the record, including the DVD, demonstrate that there were other alternatives available to Mr. Holman other than to step onto the private property? By his own admission in his deposition testimony, Mr. Holman indicated he could have walked down the alley. The truck was making the turn into the alley. Obviously, he couldn't walk out in front of the truck. I mean, that's the whole traffic safety concern that we're trying to alleviate. My recollection of his deposition testimony was that he did say that he could walk, and he could walk. There's a curb separating the parking lot from the alleyway. He knew what was beside it was private property. I believe his deposition testimony was that he could have continued to walk back down Rose Alley, away from Planned Parenthood, towards the printing business. If the officer testified, I'm at 277 now. Let's see. So as the truck was coming in this way, he could have just walked back up the alley. The truck was practically at a standstill. There's the old area back here to go to. I don't know if he could have directly gone across the alley. He says, I've told him several times to stay out of the alleyway. He knew he wasn't supposed to be there. Your Honor, it's two different things. If he was going across the alley, he'd be walking right into the path of the 18-wheeler. There's nothing that precluded him from walking along the curb, along the parking lot, and walking back there. He shouldn't have been lingering in the alley to begin with. If your position is that he shouldn't have been in the alley to begin with, wouldn't that be the thing for the officer to arrest him for? This isn't a standard form of trespass, is it, that we're talking about? Sure it is. You know that it is private property. He admitted in his deposition that he knew from prior occasions that the owner or lessee of that property did not want them on that property. So he had no privilege to be on that property. And then he makes his own necessity by doing what he shouldn't have been doing, which was lingering in the alley. That serves no legitimate purpose. Yes, he could have also been charged with disorderly conduct. And I'm sure that if Officer Koltenovich- Could have? For stepping on a- No, no, no. In terms of being in the alleyway, according to Judge Pollack's question on that. But he was not. What he was charged with was defiant trespass. He'd been told not to do this, to depose the safety rips if he did do this, because there's tractor-trailers that come down there. And, in fact, he decided not to heed that command, admonition or order. When was it that he was told and by whom? That very morning and on prior occasions by Mr. Holman's own deposition testimony. And what was the disposition of the defiant trespass charge? The defiant trespass charge went to a hearing in front of the district justice. District Justice Haskell said that he fully understood why the officer had charged him for defiant trespass. But the charge was he was acquitted of that. But an acquittal in front of a district justice does not negate the existence of probable cause. An acquittal in front of anybody, but by itself, does not negate the presence of probable cause. Well, the interesting thing is during the proceeding in front of Haskell, the prosecutor took the position that he couldn't prove the summary offense with which he was charged, but he could prove defiant trespass. He was charged with misdemeanor defiant trespass. Which have elements that didn't exist here, isn't that correct? No, they did exist. If you are specifically put on notice of that and you trespass anyway, that raises it to the level of misdemeanor. What a prosecutor feels he can or cannot prove beyond a reasonable doubt before District Justice Haskell does not impact on whether there was probable cause to issue the citation. Your Honor, since you asked to address the Radish v. Good decision, I found it interesting in reviewing the Sands v. McCormick case, which was cited in Judge as a Third Circuit case, 502 F. 3rd. 263. It is cited as an unpublished opinion. It had just come out before Judge Jones. It was September 18th of last year. Judge Jones wrote his three opinions in October. In Sands, the argument was that, I believe it was Judges Glover-Royce and Roth. In Sands, there was a criminal charge and it escapes me what the criminal charge was, but the criminal defendant's defense was that it was barred by the statute of limitations. Statute of limitations is an affirmative defense, not to be raised to the officer issuing the citation, but to be raised in a judicial proceeding. It was raised in a judicial proceeding. Cynthia Sands was acquitted and, of course, the inevitable Section 1983 claim was then filed. Well, the Third Circuit in Sands said that, we do not agree that you can place that type of responsibility on an arresting police officer. Well, that's true. He's not going to know the statute of limitations right then and there. Well, isn't justification... And similarly, in another case, he's not going to know whether somebody's property is there. But in a necessity defense, when the officer says, the truck came, he jumped up on the curb, he, you know, touched on the property, there was nowhere else for him to go. The officer didn't say there was nowhere else to go. He couldn't go across this way, moving lateral, not parallel to the parking lot. So maybe it doesn't fit, but certainly that type of defense differs from a statute of limitations. Okay. In Sands, the Third Circuit said, I believe that the three-judge merits panel in Sands got it right. I think that Judge Jones was correct in relying upon Sands. What if there was nowhere else for him to go? And what if the officer clearly testified? He jumped up there.     He jumped on the curb. He jumped on the curb. He jumped on the curb on the property because there was nowhere else for him to go or he was going to be run down. Wow. Was that too much of a burden for the... but I arrested him for trespass anyway. I still think that there would have been probable cause based upon the facts of being told don't be there. And he did it anyway. You created your own defense. In terms of... Appellate's counsel's arguments in terms of affirmative defenses and things of that nature, I'm not sure which case, whether it was Snell or Holman, he was tying it to. It seems to me that under Appellant's theory of interpreting radish versus good, you could never have an arrest for constructive possession of drugs in an apartment. You could never charge one person because there's always the affirmative defense that it wasn't my drugs. It wasn't my property. You got the wrong guy. I mean, you could never do that then. You could never have an arrest for that, that basically the officer would file the criminal complaint charging you with possession, constructive possession of a controlled substance. You can then go and put on an affirmative defense at trial that the drugs were, you know, my evil twin brother Skippy's, not mine. Well, but it depends entirely on the facts. Tell me, is there a fact issue in the Snell situation with what happened here and whether Snell was he being disorderly when he was arrested or had he been disorderly? What was the justification for that arrest at the moment he was arrested? Okay. One thing I do want to point out before I respond to your question, and it is partially responsive to your question, is that in his own deposition Snell admitted that he was not charged with being in the alley. He was told that day, he was told more than four and a half years before that by a district justice, it may have been Haskell, I'm not certain of that, that basically that you can't impede the progress of, bump, have physical contact with people in the alley. He was given the same directive, order, command, whatever you want to call it. And he testified he did not impede anyone and he did not block anyone. All right. There is a group of people going across the 20-foot alley with two-way traffic. An individual gets in front of that group. As your Honor pointed out, the one playing Parenthood, I believe it was an escort, said he was in his face, stopped from Sergeant Camacho's vantage point. That was Sponseller. Yes. Okay. That happens. He goes and gives the same, repeats the same command that he had just given minutes earlier to Snell not to do that. Another car pulls up, goes into the parking lot. That group of people go from the parking lot across the alleyway. There's testimony that it's when the car pulls up and he's going towards the car that he is arrested, that in fact he was arrested before he got there. I mean, there's testimony to that effect. My recollection of the testimony was there was a second car that pulled up and dropped off, was surrounded by escorts. Mr. Young, let's assume that we decide that there is an issue of fact with the Snell case, just for argument purposes here. What about the invocation of qualified immunity from the officers? Your Honor, I believe under Williams v. Fedor or Fedor v. Williams, I'm sometimes dyslexic on that case. I believe that an officer is allowed to rely in good faith on the advice of a prosecutor who is trained in the law. It's undisputed in this case that the contact was made with Bill Groff, the Assistant District Attorney for York County, that based upon the first time Camacho was out there at this location and what he observed, if he saw people impeding other people or bumping or having physical contact with individuals attempting to cross the narrow alleyway, would he be justified in filing a criminal charge and what criminal charge should he file? Under those circumstances, that's what officers are encouraged to do. Whether it's on patrol, if they have a question as to whether it's criminal, and if so, what violation it is, you contact. That's why there's on-duty Deputy District Attorneys in all counties, particularly in York County. He gave a fact scenario that he was likely to encounter the second time that he went out on this assignment, which was November 3, 2004, asked the prosecutor for legal advice. Is that a violation of the Crimes Code, and if so, what provision? He was told that if he perceived that conduct occurring, he was within his bounds to cite the individual for disorderly conduct. He followed that legal advice on the morning of November 3, 2004. I don't even think you get to the second prong of the qualified immunity analysis. And, Your Honor, I don't want to debate you based on your concurrence in the Groff decision earlier this summer, whether saucier should still be followed. But I don't think that there is a factual issue. I believe that the Fourth Amendment unlawful arrest claim is barred by the existence of probable cause. But based upon Your Honor's question, if there is a fact on that, in terms of whether it is a constitutional violation on the facts as they existed there, the qualified immunity defense says as a matter of law that Sergeant Camacho could rely, and did reasonably rely, on the advice he got from the ADA. That's a classic application of qualified immunity. If we were to conclude the summary judgment was erroneous, in this case, with respect to the First Amendment claims of the three, so that the matter would have to go back for a hearing on the merits, would you not think then that the issue of qualified immunity would have to be reexamined in the light of whatever determination was made on the claim of constitutional right? Not as to the request, application of qualified immunity, with the unlawful arrest claim involving Sergeant Camacho arresting Mr. Snell. In terms of the First Amendment... That qualified immunity was not addressed below, was it? It's on pages 21. Basically what it was, was that under the first prong associate, if there's no constitutional violation, you don't really reach that issue. So the district court didn't reach that. We raised that issue in terms of Williams v. Fedor in our brief down below. We certainly put all those facts in the record, and we cite it in our standard of review under BRISBOW and a whole line of cases that you can affirm a right result reached for another reason. And I think that that would be that... But if we were to reverse and find there was a constitutional violation, would we address qualified immunity on our own or send it back for the district court to do that? Are you referring to qualified immunity as it applies to the First Amendment claim or as it applies to the arrest claims? Well, as the First Amendment. I don't think that the district court, since it never got to the second aspect of qualified immunity in terms of whether a reasonable mistake by an officer. I would like to weigh in just... So you're saying that the district court would do that in the first instance? I think you can say that as a matter of law under the circumstances that a reasonable officer based upon the state of the law, the information that he had at his disposal, what he witnessed there that day as a matter of law did not violate the First Amendment. I do want to get back to the substance of the First Amendment claim because we've gotten off what is really the main claim. It was not based on content. It was generally applicable. It had an incidental, if any, burden on their First Amendment rights. I'm sure if you went there this Friday, those same individuals would be at the Planned Parenthood facility. It was in furtherance of a compelling governmental reason based on the Schenck and Madsen cases relied on by Judge Jones. The Starzell decision earlier, I believe in May of this year, is instructive. It says the principles of the First Amendment, it's 533, Fed Third 183, I'm referring to 196 and 197. The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction relying on Poulos v. New Hampshire from 1953. Indeed, nothing in the Constitution requires the government freely to grant access to all who wish to exercise their right to free speech on every type of government property without regard to the nature of the property or the disruption that may be caused by the speaker's activities relying on Cornelius. Therefore, although the ability of the state to limit activity in a traditional public forum is sharply circumscribed, the state remains free to take action to maintain public order and safety. That's exactly what was done here. The same rules apply to both sides. There were ample alternative avenues of communication ringing the facility. I believe that the district court's erudite rulings reflect a common sense approach in applying well-established First and Fourth Amendment jurisprudence to the facts of these three consolidated appeals. I would urge Your Honors to affirm all three, and I apologize if I went 30 seconds over. Thank you, Counselor. Rebuttal. Thank you, Your Honors. In all three cases, there are factual issues that should preclude summary judgment. Most significantly is the safety issue. There's a disagreement on safety in all three of these cases. In the Snell case, for instance, public safety was raised afterwards. Clearly, others in the city weren't told that they couldn't use alleys, couldn't walk in alleys, couldn't cross alleys. The only place where people were prohibited was here outside the abortion clinic. And I think there are factual issues here that a jury could conclude that the actions of the police officers were based on content. So I believe that needs to be sent back down for trial. But there's numerous safety questions and other questions in all of the cases. For instance, the judge found that Sergeant Barth acted because of safety concerns, but his complaint report specifically states that he didn't think that there was a safety concern arising out of the June incident, and that if he thought there was a safety concern, he would have done something about it. The location of the sidewalk and whether the sidewalk itself was an ample alternative is a question that should go to the jury. What is there in the record to demonstrate that it was not? That it was not an ample alternative. In order to have a genuine issue of fact, you have to have the facts raised by the. Well, I believe that it's sufficient to say that the sidewalk was nowhere close to the area that they wanted to be through the back of the facility. And. Did it extend back to the ramp? No, it didn't extend to the rear entrance. It was only along Beaver Street, which is the front of the property. So the judge actually, the description that the judge gave in his opinions was confusing at best as to where the location of the alley was. There wasn't where the location of the sidewalk was that the sidewalk went along the side of the Planned Parenthood facility and basically paralleled the length of the alley. I think we would both agree that the sidewalk, the sidewalk was only along Beaver Street on the front. The alley. There's a dispute here. We'll have to look at the photograph. So there are a lot of factual disputes in this case. And in the issue of whether Mr. Snow had less than equal access, that's a factual question that that needs to be dealt with. If you look at the police officer's own testimony as to what he said to the groups, he said, yeah, I told Mr. Snow he couldn't be on the alley at all. And the other people, I don't remember telling them that they couldn't be there. So there are factual issues that need to be dealt with. What Mr. Snow was doing in the alley, was he harassing people, bumping into people, or was he just handing out literature? So with these group of factual issues, summary judgment was premature. I'd also like to just take a moment to retract the statement that I said about trespass earlier. I don't think that a trespass is made, even in the first instance, because I don't think there was criminal intent. I think he was just reacting to try to get the quickest way that he could out of danger without necessarily thinking through anything other than that. But there was an admission that he had been told, correct? Oh, yeah. Yeah, he had been told that he should not be in the alley. And he had been told that he should not be in the parking lot. I think Judge Rendell was asking whether he'd been told, whether it was agreed that he'd been told that he should not be on the property. Yes. There's no question that he understood he was not to be in the parking lot. Which is the only way you can make out an element for defiant trespass, that is some kind of notice. Right. He had notice. I'm just claiming that he didn't have the criminal intent to be there. Also, a significant issue is the error in dismissing the city at the motion to dismiss. We had pled the elements in the complaint necessary for... Really? There's one statement about under color of law. It's a very, very vague statement in all of the three complaints. I don't have it right in front of me, but to my mind it did not plead custom policy or done by a supervisor, anything that you really need under Monell. Thank you, Your Honor. In all three of the cases we had, the pleadings were similar in all three. And we said that there were threats and arrests on multiple occasions and had been told to leave the alley. We alleged a policy of ignoring First Amendment rights and we alleged the acts were pursuant to the customs and usages of the city of York. So the city should have been on notice that what we were claiming. Where is the appendix if you have that? Your Honor, I don't have the page number immediately, but I know that it's in appendix two of each of those appendixes and it's probably about 20 pages in right after the court's opinion. But in all three of the complaints, I think the city's on notice that our concern was being told to stay out of the alley and that there was a pattern of being told to stay out of the alley and there was a custom of being told to stay out of the alley and I'm not sure how we could have pled that one with any more specificity. Well, isn't this what you said? All of the acts of the defendants and their agents, as alleged, were conducted under color and pretense of the statutes, ordinances, regulations, customs or usages of the city of York. Isn't that the statement? Yes, we said that in the prior paragraph talks about the city's policy of ignoring First Amendment rights and the paragraph prior to that talks about the threats and arrests on multiple occasions and have been told to leave the alley. So that should be enough to have put them on notice as to what our claim was. What notice would they have except that municipality was alleged to ignore unconstitutional treatment? Well, I think it was the specific paragraph. In the McTiernan case, it was paragraph 33, but it was a different number in each of the complaints where we were talking about the threats of arrest and on multiple occasions being told to leave the alley. That was the moving force in all three of these cases, the threats of arrest for using the alley. And I don't know how we could have pled that with any more specificity. We're not saying that there was a municipally adopted policy. What we're saying is that police officers, various officers have done that on enough occasions that there's a custom and practice in place. But it's not a policy from above. Not an enacted policy, no. And so you can't plead that any more specifically if it's just a custom and practice. Isn't it the theory of the complaint, each of the complaints, the officers were working as employees, if you will, of Planned Parenthood? No, that's an allegation in the complaint. But the working argument that we had in the complaint that we also made in the briefs down below and that we also made in the briefs up here were the custom and practice of threats for arrest of using the alley. We never made a claim that the municipal liability attached to police officers being assigned to the facility. That's not remotely what we had in mind as far as municipal liability. Thank you very much, Your Honors. Thank you, Counsel.